UNITED STATES of America, Appellee,

v.

Troy P. CAMPBELL, Appellant.

UNITED STATES of America, Appellee,

v.

Luther D. WHITE, Appellant.

Nos. 87–1234, 87–1235.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 13, 1987.

Decided May 4, 1988.

J. Daniel Stewart, Asst. U.S. Atty., Kansas City, Mo., for appellee.

Before ARNOLD and BOWMAN, Circuit Judges, and ROSS, Senior Circuit Judge.

ROSS, Senior Circuit Judge.

Troy P. Campbell and Luther D. White appeal from their convictions by a jury of one count of conspiracy to defraud the United States Department of Housing and Urban Development (HUD) in violation of 18 U.S.C. § 371, four counts of making false statements in a matter within the jurisdiction of the United States in violation of 18 U.S.C. § 1001, and one count of making a false statement to influence HUD in violation of 18 U.S.C. § 1010. Both appellants were sentenced to three years imprisonment followed by five years probation, fined $10,000 and ordered to pay $35,500 restitution to the City of Kansas City, Missouri. For reversal, appellants make four arguments: 1) that the trial court[1] erred in failing to grant appellants' motions for judgment of acquittal as there was insufficient evidence to support their convictions; 2) that the trial court erred in admitting evidence of the prior felony convictions of an unindicted co-conspirator; 3) that the trial court erred in excluding certain hearsay testimony; and 4) that the trial court erred in ordering appellants to pay restitution. For the reasons set forth below, we affirm.

*Background*

The charges against appellants arose in connection with a HUD-financed construction project in Kansas City, Missouri. In April, 1982, the City of Kansas City selected MBI, a real estate development company, to develop a housing project in inner-Kansas City called the Citadel Center. Appellant Campbell was president of MBI. Douglass State Bank provided MBI a loan for $485,445 to purchase the land for the Citadel project, and later provided a letter of credit to enable MBI to receive a $1.25 million HUD loan. Appellant White was

James L. Eisenbrandt, Overland Park, Kan., for appellant.

1. The Honorable Joseph E. Stevens, Jr., United States District Judge for the Western District of Missouri.

chairman of the loan committee and the largest stockholder of the Douglass State Bank. The indictment in this case alleged that Campbell, White, and an unindicted co-conspirator, Curtis W. Venerable, Sr.,[2] conspired to defraud HUD by submitting fictitious billings for work not performed at the Citadel project, and subsequently covering up the fraud by use of a number of fraudulent documents.

Construction work at the Citadel site began in late August, 1982. The evidence at trial showed that on November 4, 1982, MBI submitted its first request for funds under the $1.25 million HUD loan. The source of the loan funds was the HUD Community Block Development Fund. The fund was administered by the City of Kansas City, Missouri, which disbursed the funds through the Housing Development Corporation Information Center (HDCIC). Based on MBI's initial request, HDCIC issued to MBI a check for $614,916.

Even though the first request for funds was based on invoices submitted by Tri–City Construction Company, the subcontractor primarily responsible for site preparation work at the Citadel Center, upon receipt of the HDCIC funds MBI issued a check for $114,000 to B & G Enterprises. B & G was owned by White and managed by Venerable. White had Venerable deposit the $114,000 in an account in the name of B & G Enterprises. The signature card on the account listed Venerable as the sole owner of B & G. The second signature on the account was that of Don Davis, which the evidence showed was an alias used by White. After the $114,000 was deposited into B & G's account, White had Venerable issue a B & G check for $110,000 to D & H Realty, another company owned by White. Subsequently, D & H Tire Company, another White company, issued a check to T.P. Campbell for $15,000. The government argued that the appellants thereby attempted to launder the HUD funds through the B & G account.

On December 2, 1982, Campbell submitted MBI's second application for funds under the HUD loan in the amount of $618,300. Campbell submitted with this application two documents pertaining to B & G and MBI. The first was a contract-invoice dated August 13, 1982, between B & G and MBI in which B & G agreed to do preliminary site grading and ground preparation at the Citadel project for $225,000. The second document was an October 20, 1982 billing invoice to MBI from B & G in the sum of $135,000 based on the parties' August, 1982 contract-invoice. HDCIC paid MBI the total amount of the second request.[3]

In May, 1983, Campbell issued another MBI check to B & G Enterprises for $100,000. White had Venerable put this check into B & G's account and subsequently issued a B & G check for $100,000 to D & H Lumber, another of White's companies.

Although MBI submitted B & G's invoice in its application for HUD funds, and although MBI paid B & G a total of $214,000, the evidence at trial showed that B & G did little if any work on the Citadel project. The president of Tri–City Construction Company, which actually did the site preparation work, testified that he had never seen B & G doing any site preparation at the Citadel project. Several other subcontractors testified that they did not see B & G at the construction site and did not know of B & G doing any construction work on the project. Further, MBI's own employees indicated that B & G had not done construction work on the Citadel site. MBI's project superintendent testified that he had never encountered B & G, and MBI's accounting clerk testified that she had never seen any invoices from B & G.

In early 1983, HDCIC began reviewing the billing invoices submitted by MBI in

---

**2.** Curtis W. Venerable, Sr. was charged separately for his part in the fraudulent billing scheme. His convictions for conspiracy to defraud HUD and for making a false statement were affirmed by this court in *United States v. Venerable*, 807 F.2d 745 (8th Cir.1986).

**3.** In January, 1983, MBI applied for a third advance under the initial loan in the amount of $16,724. The HDCIC issued MBI a check in this amount, thereby advancing MBI all the funds under the $1.25 million loan.

MBI's requests for funds. The evidence showed that in response to this investigation, appellants caused a number of fraudulent documents to be submitted to HDCIC and HDCIC's auditors. First, HDCIC asked Campbell for B & G's Davis–Bacon forms, which were forms to be signed by B & G's owner ensuring that the employees on the project were paid the prevailing wage. Despite the fact that White owned B & G, White had Venerable sign the Davis-Bacon forms stating that Venerable owned B & G. In the fall of 1983 White had Venerable sign a lien waiver and submit it along with a letter to HDCIC's auditors stating that B & G had received $135,000 from MBI for site grading and ground preparation work performed by B & G at the Citadel project. Campbell and White then told auditors that there were no further documents relative to the subcontract agreement between MBI and B & G. However, in March, 1984, Campbell gave HDCIC auditors a "Subcontract Agreement" allegedly dated January 7, 1982, between MBI and B & G which provided that B & G would do preliminary site preparation and consulting work on the Citadel project. The government alleged that this subcontract had been backdated to mislead the auditors, HUD and HDCIC.

*Discussion*

### A. *Sufficiency of the Evidence*

 Appellants argue that the trial court erred in failing to grant their motions for judgment of acquittal because there was insufficient evidence to support their convictions. In reviewing the denial of a motion for judgment of acquittal, this court is to consider the evidence in the light most favorable to the government and give the government the benefit of all reasonable inferences which logically may be drawn from the evidence. *Rothgeb v. United States*, 789 F.2d 647, 648 (8th Cir.1986). The jury verdict is to be overturned only if the evidence is such that reasonably minded jurors *must* have a reasonable doubt as to the existence of any of the essential elements of the crime. *Id.*

Count one of the indictment alleged that Campbell, White and Venerable conspired to defraud HUD in violation of 18 U.S.C. § 371.[4] The indictment alleged that as part of the conspiracy Campbell obtained the loan for the Citadel land from Douglass State Bank where White was chairman of the loan committee, and subsequently obtained the letter of credit from the Douglass State Bank which enabled MBI to get the $1.25 million HUD loan. It further alleged that White and Venerable, through B & G, billed MBI for work that was not done at the Citadel, and that Campbell approved the fictitious billings and certified to HUD, HDCIC and the City of Kansas City that the billings were legitimate. Further, the indictment alleged that Venerable maintained to the HDCIC that he, rather than White, was the owner of B & G. As part of the conspiracy the indictment further alleged White received substantial sums of money for work which was not performed. Finally, the indictment alleged that appellants attempted to conceal the nature and object of their conspiracy. The indictment charged twelve overt acts committed by appellants in furtherance of the conspiracy, including drafting of the contract-invoice stating that B & G would do site grading and ground preparation for $225,000 at the Citadel project and B & G's subsequent billing invoice for $135,000 based on the contract invoice; the payment of $114,000 from MBI to B & G and subsequent transfer of funds among White's accounts; the request for HDCIC funds by Campbell based in part on the $135,000 B & G invoice; the submission of the fraudulent Davis–Bacon forms, lien waiver, letter, and subcontract agreement to HDCIC and its auditors; and the payment of $100,000 from MBI to B & G and subsequent transfer of funds from B & G's account to another of White's accounts.

---

4. 18 U.S.C. § 371 provides:

 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Appellants in this case argue that there was insufficient evidence to support the conspiracy charge as there was no direct evidence of a conspiratorial agreement between Campbell and White. Further, appellants argue that there was no evidence that appellants had any motive to defraud the government or engage in a "kickback" scheme, but argue rather that the evidence showed that the billings made by B & G were made in good faith without intent to defraud HUD.

A conspiracy under 18 U.S.C. § 371 consists of an agreement to defraud the United States along with an act by one or more of the conspirators to effect the object of the conspiracy. *United States v. Pintar,* 630 F.2d 1270, 1275 (8th Cir.1980). The agreement "may consist of nothing more than tacit understanding." *Id.* "The existence of the agreement may be shown by circumstantial evidence, including the conduct of the conspirators and any attending circumstances, particularly circumstances indicating that the defendants 'acted in concert to achieve a common goal.'" *Id.* (quoting *Hamling v. United States,* 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974)).

Upon reviewing the evidence in this case, we find sufficient evidence for the jury to convict appellants on the conspiracy count. Despite appellants' assertions that B & G performed substantial site grading and ground preparation at the Citadel site, none of the other subcontractors knew of B & G doing such work. Even though there was testimony that White's employees may have cleared a small portion of the Citadel land on which they put a construction trailer, MBI's vice president testified that the value of B & G's services was at most $25,000, rather than $135,000 as set out in B & G's billing invoice. Although appellants claim White did a substantial amount of consultation work on the Citadel project, there was no evidence as to the amount of time he worked on the project or the reasonable value of the consultation, nor were there any invoices or bills submitted to MBI for White's consultation work.

As further evidence of the conspiracy, the testimony at trial revealed that White had Venerable sign the $135,000 billing invoice on behalf of B & G knowing that B & G had not performed the work at the Citadel site. Further, Campbell submitted B & G's contract invoice and billing invoice to HDCIC certifying that the documents were legitimate despite his knowledge to the contrary. The evidence established that MBI paid B & G $114,000 in November, 1982, and $100,000 in May, 1983, and that White transferred the funds from these checks into his other companies' accounts. Finally, when the HDCIC began auditing MBI's payments under the loan, Campbell and White both submitted or caused to be submitted several fraudulent documents. Based on the above, we find ample evidence on which the jury could have found that White and Campbell knowingly agreed to and actively participated in the scheme to defraud HUD.

Next, appellants argue that the trial court erred in failing to grant their motions for judgment of acquittal on counts two through six, which related to the submission of fraudulent documents. Appellants contend that there was insufficient evidence for the jury to find that appellants had the requisite intent to commit the offenses.

Count two charged that appellants knowingly caused to be made false statements in MBI's second application for funds under the HUD loan by including in the application the B & G invoice for $135,000 despite knowing that B & G had not performed the work at the Citadel site. Count four charged that appellants caused to be made the lien waiver signed by Venerable which falsely stated that B & G had performed site grading and ground preparation work at the Citadel site. Count five charged that appellants caused to be made the letter signed by Venerable which falsely stated that B & G had performed certain work at the Citadel site for which it had received $135,000 from MBI. Finally, count six charged that appellants caused to be made the January 7, 1982 subcontract agreement between MBI and B & G knowing that the

document was falsely dated and not in effect on the date indicated.

■ Counts two, four, five and six alleged violations of 18 U.S.C. § 1001, which prohibits any person from "knowingly and willfully" making false statements in a matter within the jurisdiction of a United States agency.[5] Our review of the evidence convinces us that there was ample evidence from which the jury could have found that appellants "knowingly and willfully" made the false statements in the documents which were submitted to HDCIC and HUD.

■ Count three charged that appellants caused to be submitted to HDCIC the Davis–Bacon wage statements which falsely stated that Venerable rather than White owned B & G. Count three alleged a violation of 18 U.S.C. § 1010, which prohibits the making of a statement knowing it to be false for the purpose of influencing HUD.[6] The record shows that there was sufficient evidence for the jury to find that White and Campbell had Venerable sign the Davis–Bacon forms as the owner of B & G in order to mislead HUD and HDCIC as to White's interest in B & G and to influence HUD and HDCIC as to the validity of the billing invoice submitted by B & G.

Appellants also argue that there was insufficient evidence for the jury to find that the statements which served as the basis

for counts four and six (regarding the lien waiver and subcontract agreement between MBI and B & G) had the requisite materiality as required by 18 U.S.C. § 1001. Appellants argue that the lien waiver was incapable of inducing payment because an HDCIC official testified that HDCIC did not require the document as HDCIC had no security interest in the Citadel project due to the fact that MBI's loan was secured by a letter of credit. Further, appellants argue that the subcontract agreement between MBI and B & G dated January 7, 1982, was incapable of inducing payment because the auditor for HDCIC retained the agreement in its file rather than passing it along to HDCIC or HUD.[7]

■ In *United States v. Richmond*, 700 F.2d 1183 (8th Cir.1983), this court set out the standard for determining materiality of a false statement for purposes of 18 U.S.C. § 1001:

To establish materiality of a false statement it is not necessary to show that a government agency actually relied on the statement, that the government suffered pecuniary loss as a result of the statement, or that the false statement was sufficient to induce a payment or benefit. Rather, materiality involves only the *capability* of influencing an agency's governmental functions, i.e., does the statement have a "natural tend-

---

**5.** 18 U.S.C. § 1001 provides:
Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**6.** 18 U.S.C. § 1010 provides in part: "Whoever * * * for the purpose of influencing in any way the action of [the Department of Housing and Urban Development], makes, passes, utters, or publishes any statement, knowing the same to be false, * * * shall be fined not more than $5,000 or imprisoned not more than two years, or both."

**7.** Appellants also argue that the subcontract agreement between MBI and B & G dated Janu-

ary 7, 1982, was immaterial because it was submitted to HDCIC's auditor after Campbell had paid back to the HUD loan fund the $135,000 received for B & G's billing. The evidence at trial showed that after articles in a local newspaper questioned the $135,000 payment to B & G by MBI, Campbell sent a check to the City of Kansas City, Missouri for $135,000 for reimbursement of the amount paid to B & G. Campbell included with the check a letter which stated "[b]ecause of the notoriety, confusion and malicious speculations directly directed by certain print media, to destroy this project, we are hereby returning $135,000 to remove this false objection and allow us to complete Citadel Center." We reject appellants' materiality argument. Even though the subcontract was submitted after payment was made to B & G, the subcontract had the ability to influence HUD's decision as to whether the payments to B & G were legitimate.

ency to influence or is it capable of influencing agency decision?"

*Id.* at 1188 (citations omitted).

In the present case, the submission of the lien waiver and subcontract agreement by appellants served to convince HUD and HDCIC that B & G performed the work on the Citadel project and that its billing invoice was legitimate. Even if HUD and HDCIC did not rely on the documents, the documents served to make the payments to B & G appear legitimate, and therefore they had the capability of influencing HUD and HDCIC. Consequently, we find that there was sufficient evidence on which the jury could find that the statements were material.

### B. *Venerable's Prior Convictions*

Appellants next argue that the trial court erred in allowing the government on redirect examination to question Curtis Venerable about his prior convictions for fraud against the government. The government called Venerable as a witness in its case in chief. A good part of Venerable's testimony concerned the documents he prepared on behalf of B & G and the bank account which he opened in B & G's name. On cross-examination, Venerable testified that B & G was created so that White's construction company could engage in residential construction without having to pay union wages. Venerable stated that B & G was actively engaged in purchasing real estate and rehabbing houses. Venerable further testified that he never heard or participated in any conversations concerning B & G's billing on the Citadel project for work never done. Venerable testified that he did not know that federal funds served as the source of the May 11, 1983 $100,000 check from MBI to B & G.

On redirect examination, the government sought to impeach Venerable by asking him about his prior convictions. Before Venerable could respond, the trial court instructed the jury that evidence of Venerable's prior convictions could only be used for the limited purpose of determining Venerable's credibility and was not to be used as evidence of Campbell's and White's

guilt. Then, the government questioned Venerable as follows:

[Assistant United States Attorney]: Mr. Venerable, as you sit here today, you are a convicted felon, are you not?

[Venerable]: That's correct.

[Assistant United States Attorney]: That felony conviction related to fraud against the Federal Government?

[Venerable]: Correct, that's correct.

Appellants now argue that admission of the evidence of Venerable's prior convictions was prejudicial error because the evidence was offered not for impeachment but as substantive evidence of appellant's guilt.

[8, 9] It is well established in this circuit that evidence of a co-defendant's guilty plea or conviction may not be admitted as substantive evidence of the defendant's guilt. *See United States v. Hutchings,* 751 F.2d 230, 237 (8th Cir.1984), *cert. denied,* 474 U.S. 829, 106 S.Ct. 92, 88 L.Ed.2d 75 (1985); *United States v. Roth,* 736 F.2d 1222, 1226 (8th Cir.), *cert. denied,* 469 U.S. 1058, 105 S.Ct. 541, 83 L.Ed.2d 429 (1984). However, such evidence may be admitted to reflect on the witness' credibility or to show his acknowledgment of participation in the offense. *Hutchings, supra,* 751 F.2d at 237. In such a case, the trial court should instruct the jury that the evidence is admitted for this limited purpose and that the jury may not infer the defendant's guilt from the evidence. *Roth, supra,* 736 F.2d at 1226.

The trial court in the present case properly admitted the evidence of Venerable's prior convictions. First, the evidence was properly admitted for the purposes of impeachment. Venerable had testified on cross-examination that B & G was a legitimate, ongoing construction business, and that he had no knowledge of any conspiratorial conversations concerning the fraudulent billing for the Citadel project. The government sought to undermine Venerable's veracity and the credibility of his assertions on cross-examination with evidence of his prior convictions. We find that the

evidence of Venerable's convictions for fraud against the government properly went to the issue of his credibility.

Second, we note that a proper limiting instruction was given. Further, the record reveals no evidence that the government improperly emphasized Venerable's convictions or used his conviction as substantive evidence of appellants' guilt. *See Roth, supra,* 736 F.2d at 1227. To the contrary, the questions eliciting the evidence of Venerable's convictions were worded such that the jury was not told that Venerable's convictions arose from the same scheme to defraud HUD for which Campbell and White were being tried. Consequently, we find that the trial court properly exercised its discretion in admitting the evidence of Venerable's prior convictions.

### C. *Hearsay Testimony of Curtis Fairley*

Appellants contend that the trial court improperly excluded as hearsay the testimony of Alex Harris as to statements made to him by Curtis Fairley, who was deceased by the time of trial. Harris was going to testify that Fairley told him at a contractors' meeting that Fairley was doing work at the Citadel project. Appellants contend this evidence was probative to show that White had hired subcontractors to work for B & G at the Citadel site and to refute the government's position at trial that B & G had not done the work for which it had billed MBI.

Appellants contend that Harris' testimony should have been admitted under the "residual" hearsay exception, Fed.R.Evid. 804(b)(5). The residual exception provides for the admissibility of a statement made by a declarant who is unavailable to testify if the statement has circumstantial guarantees of trustworthiness, is offered as evidence of a material fact, and is more probative than any other evidence which the proponent can procure through reasonable efforts, and if the interests of justice would best be served by admission of the statement. Fed.R.Evid. 804(b)(5).

We determine that the trial court did not abuse its discretion in disallowing Harris' testimony. The evidence was not more probative than the other evidence presented at trial on the issue of whether Fairley worked at the Citadel site. During the trial, a secretary who was present when White gave a statement to the FBI testified from her notes that White told the FBI agent that he paid Curtis Fairley $9,000 cash to do certain work at the Citadel site. However, White did not produce any documents to evidence this transaction. On the other hand, the FBI agent testified that White told him it was Curtis Venerable whom he had paid to do the work at Citadel. Further, Curtis Fairley's accountant testified that he could not find any invoices or payment receipts for any work for Fairley on the Citadel project. He further testified that Fairley did not accept cash payments for his construction jobs. The vice president of Fairley's construction company also testified that he had no knowledge of Fairley working on the Citadel project, although Fairley's company did work for the City of Kansas City, Missouri on a police station near the Citadel project in 1982.

Further, there is a question as to whether the statement had circumstantial guarantees of trustworthiness. At trial the government presented testimony which indicated that there could have been confusion as to whether Fairley meant he worked on the Citadel site, or whether he meant that he worked nearby at the project on the police station. Additionally, there was no testimony by any of the other contractors at the meeting where Fairley allegedly made his statement about working on the Citadel site.

The government further contends that Harris' testimony as to Fairley's statement was not material. We agree. Even if the evidence had been admitted, it could have explained only $9,000 of the $135,000 bill claimed by B & G. Therefore, we find that the trial court did not abuse its discretion in refusing to allow the testimony.

### D. *Restitution*

Finally, appellants contend that the trial court erred in ordering each of them to pay the City of Kansas City, Missouri restitution in the sum of $35,500. Appellants argue there was no evidence that the city suffered a loss in that amount. A trial court may sentence a defendant to make restitution to aggrieved parties for actual damages caused by the defendant's crime. 18 U.S.C. § 3651.[8] The court may order the restitution only in the amount of actual damage or loss as has been ascertained by the court or by stipulation of the parties. *United States v. Missouri Valley Const. Co.*, 741 F.2d 1542, 1548 (8th Cir.1984) (en banc).

In determining the amount of restitution to be paid by appellants, the trial court considered that B & G received a total of $214,000 from MBI. The appellants had already paid back $135,000 to the City of Kansas City, *see supra* note 7, thereby leaving a sum of $79,000. Upon his conviction, Venerable had been ordered to pay $7,900 restitution. The trial court split the remaining sum between appellants to reach an amount of $35,500 to be paid by each appellant in restitution.

Appellants contend that there is no evidence that the funds from the $100,000 May 11, 1983 check from MBI to B & G came from HUD funds. Therefore, appellants argue that there is no evidence that the City of Kansas City was damaged in any amount greater than the $135,000 which the appellants had already paid back.

Although appellants contend that MBI received funds from several sources other than HUD, there was no evidence presented as to what these other sources were or as to the amount of funds provided by these sources. The only source of MBI funds for which evidence was presented at trial was HUD funds. The government presented evidence that MBI had received not only the $1.25 million under the original HUD loan, but shortly thereafter received another $1.25 million HUD loan for the Citadel project.

Appellants note that the funds for the $100,000 check from MBI to B & G came from MBI's account at the Republic Bank of Kansas City, Missouri. Appellants thereby attempt to argue that the source of the check was not HUD funds. However, the evidence at trial did not indicate the source of the funds in MBI's Republic account. MBI's vice president testified that he did not know the source of the funds in the account. It is clear, however, that the payment from MBI to B & G was made after the entire $1.25 million in HUD funds had been received by MBI.

At their sentencing hearing appellants had set forth to the trial court their arguments as to why no restitution should be ordered. After considering these arguments and with the benefit of the presentence report, the trial court ordered the appellants to pay restitution. We find that there was sufficient evidence for the trial court to find that the source of the funds for the $100,000 payment between MBI and B & G was federal funds, and therefore, to find that the City of Kansas City through HDCIC suffered damages in that amount. Consequently, we find that the award of restitution was proper.

### Conclusion

For the foregoing reasons, the convictions of Troy P. Campbell and Luther D. White are affirmed.

---

**8.** Campbell and White were sentenced on January 28, 1987. 18 U.S.C. § 3651 was repealed effective November 1, 1987. Act of Oct. 12, 1984, Pub.L. No. 98–473, Tit. II, § 212(a)(2), 98 Stat.1987. The parties agree in their briefs that § 3651 was the applicable sentencing provision at the time of appellants' sentencing.